SHANDELL MARIE BRADLEY,          CIVIL ACTION NO. 6:15-cv-00459
TUTRIX ON BEHALF OF HER
MINOR CHILD, A.J.W.

VERSUS                           MAGISTRATE JUDGE HANNA

LOUIS M. ACKAL, ET AL.           BY CONSENT OF THE PARTIES

## MEMORANDUM  RULING

Currently pending is the motion for summary judgment filed by defendants,

Iberia Parish Sheriff Louis M. Ackal and Iberia Parish Sheriff's Deputy Justin Ortis.

(Rec. Doc. 55).  The motion is opposed (Rec. Doc. 59), and oral argument was held

on July 28, 2017.  Considering the evidence, the law, and the arguments of the

parties, and for the reasons fully explained below, this Court finds that there are

genuinely disputed issues of material fact that preclude summary judgment in the

defendants' favor.  Accordingly, the defendants motion for summary judgment is

GRANTED IN PART and DENIED IN PART.

### BACKGROUND

It is undisputed that, in the early morning hours of March 3, 2014, Victor

White, III died while in the custody of the Iberia Parish Sheriff's Office.  He died as

the result of a single gunshot wound while sitting in the back seat of a sheriff's office

patrol unit with his arms handcuffed behind his back.  White had been arrested by

Deputy Ortis, handcuffed, and transported in the back seat of Otis' unit to the parking lot of the Iberia Parish Sheriff's Patrol Center where the fatal shooting occurred.

This lawsuit was filed by Shandell Marie Bradley on behalf of her minor child AJW, who is also White's daughter. The plaintiff sued Sheriff Ackal and Ortis, individually and in their official capacities, under 42 U.S.C. § 1983. She alleged that the defendants subjected White to excessive force and acted with deliberate indifference to his medical needs, in violation of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and further alleged that their actions and omissions led to White's death. The plaintiff also asserted another Section 1983 claim, in which she alleged that the defendants violated the Fourth and Fourteenth Amendments by depriving the child of the right to familial relationships. Additionally, the plaintiff asserted a wrongful death claim, a survival claim, negligence claims, and assault and battery claims under Louisiana state law. These claims included an allegation that the defendants failed to "properly observe, maintain or otherwise protect" White's safety while he was in police custody.

In their motion, the defendants correctly point out that White was not a convicted inmate at the time of his death, and therefore, the plaintiff has no viable claim for violation of White's rights under the Eighth Amendment. The cruel and unusual punishment clause found in the Eighth Amendment only applies to treatment

of individuals convicted of a crime.[1]  Therefore, to the extent that the plaintiff seeks relief based on a violation of the Eighth Amendment (as opposed to the standard imposed by the Eighth Amendment but made applicable to pre-trial detainees under the Fourteenth Amendment), the Court will grant the motion and dismiss that aspect of plaintiff's claims under the Eighth Amendment.

The defendants also contend that Ortis is entitled to qualified immunity as the plaintiff has not shown that there was any Constitutional violation on his part or evidence to support a deliberate indifference claim.  They also contend that the plaintiff has failed to establish either an individual or official capacity claim against Sheriff Ackal.  Finally, the defendants contend that there is insufficient evidence to support any claim under state law against Ortis or Sheriff Ackal.  In support of their motion, the defendants rely heavily on the information, statements, and reports contained in the Louisiana State Police Case Report (the "LSP report") prepared and supplemented by Master Trooper Katie Morel.[2]  In addition, the defendants rely on the coroner's report, lab reports, records from Ortis, and deposition excerpts from the

---

[1]  *Palermo v. Rorex,* 806 F.2d 1266, 1271 (5th Cir. 1987).

[2]  Rec. Doc. 55-3-4 and  55-5.  The Court notes that much of what is contained in the reports is not competent summary judgment evidence; however, no objections were raised by the plaintiff pursuant to Rule 56.

testimony of Lt. Jeffery Schmitt (sometimes spelled Schmidt) and Sheriff Ackal.[3] Ortis had not been deposed at the time the motion was filed or as of the date of this ruling.

In opposition, the plaintiff contends that there are genuine issues of material fact with regard to the excessive force and the state-law claims. She relies heavily on the deposition testimony of Sheriff Ackal, Lt. Schmitt, Stacie Smith (an investigator for the Iberia Parish Sheriff's Office), Capt. Darren Bourque (the Director of Technical Services with the IPSO), video recordings of the interior of a convenience store (as well as its parking lot) where White was present prior to the shooting, and dash camera recordings from Ortis's unit. She also included a state police press release and an indictment of Sheriff Ackal and one of his supervisors at the IPSO, Gerald Savoy, in which both were charged with one count of conspiracy against rights in violation of 18 U.S.C. § 241 and deprivation of rights in violation of 18 U.S.C. § 242.[4] The charges stemmed from allegations of excessive force and physical abuse of pre-trial detainees at the Iberia Parish Jail in April 2011. The plaintiff supplemented her opposition, without objection from the defendant, with the report of an expert.

---

[3]     Rec. Docs. 55-2, 55-6, 55-7, 55-8, and 55-9, respectively.

[4]     Sheriff Ackal was charged with two counts of deprivation of rights in addition to the conspiracy count. He was ultimately acquitted after a jury trial. Savoy pleaded guilty to one count.

Following the hearing on the motion, the Court raised the possibility of taking judicial notice, pursuant to F.R.E. 201, of the testimony adduced at the criminal trial of Sheriff Ackal, as well as the stipulated factual basis for guilty pleas by multiple deputies and the warden of the jail, who admitted to the conduct set forth in the indictment of Sheriff Ackal and Savoy. The parties were given an opportunity to be heard pursuant to F.R. E. 201(e), and briefs were submitted.

## STATEMENT OF FACTS

Some of the facts contained in the record are not in dispute. However, many of the facts are taken from the LSP report, are based on hearsay, and a number of them are inconsistent to varying degrees. Since the LSP report was submitted in support of the defendants' motion for summary judgment without objection from the plaintiff, this Court has attempted to set forth all of the material facts contained within the report regardless of the source of the information.

On the evening of Sunday, March 2, 2014, an anonymous 911 call reported a fight at the Hop In, a convenience store in New Iberia, Louisiana. The report to the dispatcher was that two black males were fighting in the parking lot and one mentioned having a gun. Ortis stated in his report, which is time stamped March 12, 2014 at 1234 – nearly twelve days after the incident – that he was given no further

description of the subjects other than that they were running down Alvin Street.[5] The dispatcher remarks and narratives indicate "2 blk male fighting on the park, one mentioned a 95G and the [...illegible...] Y left running."[6]

In the "911 recording," the caller, Jason Mixon, described one of the black males as having an afro-type hair style who was wearing saggy pants with red boxers visible. Mixon further indicated that one of the men took off running down Alvin Street and said words to the other man that he was going to come back and "pop your ass."[7]

Mixon was interviewed by LSP approximately a month after the shooting regarding the 911 call. In that interview, Mixon described one of the individuals involved in the altercation as a younger man wearing sagging pants that exposed his boxer shorts and stated that he possibly had his shirt removed. The older man engaged in the fight made the comment "I have something for you" and said he was going to "put a bullet" in the other person's "ass." Mixon stated that the two men began running down Alvin Street and that was when he made the 911 call. During what is described as a clarification phase of the interview, Mixon indicated that he

---

[5]     Rec. Doc. 55-7, p. 9.

[6]     Rec. Doc. 55-7, p. 3.

[7]     Rec. Doc. 55-4, p. 30.

told the 911 dispatcher that one the men who took off running down Alvin Street was wearing a white shirt and the other one had no shirt on.[8]

Iberia Parish Sheriff's Deputies Justin Ortis and Jason Javier were dispatched to the scene. While approaching the vicinity of the Hop In, Ortis observed White and Isaiah Lewis walking together down Alvin street away from the Hop In. Ortis stopped them. The dash cam footage from Ortis's patrol unit indicates that neither Lewis nor White had an afro-style haircut, neither had sagging pants with boxer shorts exposed, and neither had his shirt off. However, White was wearing a light colored basketball jersey. In the LSP Crime Lab Report, this shirt was described as a "white and gray striped size men's large 'Brooklyn Nets' basketball A-shirt (sleeveless muscle type)."[9]

The two men identified themselves to Ortis and explained that they were not involved in the fight. According to MT Morel, "after a brief conversational exchange, Corporal Ortis was satisfied White and Lewis were not the persons involved in the fight at the Hop In store."[10] Nonetheless, Ortis informed the two that they would be subjected to a "pat-down search" and that he would run a warrants

---

[8]     Rec. Doc. 55-4, p. 9-10.

[9]     Rec. Doc. 55-6, p. 4.

[10]    Rec. Doc. 55-4, p. 32.

check and if the checks were clear they would be free to go.[11]   The record is undisputed that the warrants checks on both men were clear.

In his report of March 12, Ortis stated that after Lewis and White advised they were not involved in the fight, he told them "that they would be checked for anything illegal and for outstanding warrants and if clear they would be on their way."[12]  In his statement given to MT Morel on March 5, 2014, Ortis indicated again that he told Lewis and White "if they were not carrying anything illegal and had no outstanding warrants for their arrest, they would be fee to leave."[13]

In the LSP report of the statement by Lewis, MT Morel indicated that Lewis said "the deputy asked White and Lewis where they were coming from.  They replied they had just left the store.  The deputy inquired as to if they knew anything about a fight occurring at that location.  They told the deputy they had observed two men 'scuffling,' but those men had already left the area.  The deputy told them he would check their information then would let them go."[14]

---

[11]     Rec. Doc. 55-4, p. 32.

[12]     Rec. Doc. 55-7, p. 9.

[13]     Rec. Doc. 55-3, p. 25.

[14]     Rec. Doc. 55-4, p. 8.

Deputy Javier had also observed two people walking down Alvin Street. He approached the two individuals, detained them momentarily, and checked their identities. According to the LSP report of Javier's statement, "[u]pon questioning, they informed him they were not the persons involved in the fight. As Deputy Javier was speaking with his two subjects, he observed a unit arrive in the area and stop the other two subjects who were walking in the opposite direction. Satisfied his detainees had not been involved in any fight, Deputy Javier allowed them to leave."[15] There is no indication anywhere in the record that the two individuals stopped by Deputy Javier were subjected to a pat-down search or a warrants check.

In both the statement given to LSP and in his report, Ortis indicated that both Lewis and White were very cooperative. There is no evidence in the record that either Lewis or White ever appeared to pose a threat to Ortis's safety.

According to the LSP report, Lewis stated that "early on in the stop, Victor White told the first deputy (Cpl. Ortis) that he knew him. Cpl. Ortis acknowledged recognition of White and engaged in a conversation that lent itself to confirmation that Cpl. Ortis, in fact, knew White. Specifically, Ortis asked White how he was doing, and 'did you get a warrant or something cleared...?' He also asked White how his dad was doing and other things that led Lewis to believe they knew each other.

---

[15]     Rec. Doc. 55-4, p. 3.

-9-

Sometime later, a second (back-up) unit arrived at their location. Victor also recognized that deputy, later identified as Deputy Jason Javier and Deputy Javier recognized him."[16]

According to the LSP report, in his interview, Deputy Javier indicated that he had handled a call involving White in November 2013. He remembered the day because it was his first day on the job with the IPSO. Cpl. Ortis was assigned as Javier's training officer and was present when the interaction took place. Javier arrested White on an outstanding warrant. White was cooperative and "very polite" but was upset because he thought the warrant had been recalled but it was still active. White was arrested and taken to the IPSO jail.[17]

Ortis gave his initial interview to LSP on March 5, 2014 – two days after the shooting. The report of that interview indicates that "when asked if he knew Victor White, III, Cpl. Ortis said he looked familiar, but did not know him by name. He had no prior dealings with White that he could recall."[18] On March 26, 2014, Ortis was interviewed a second time. He was asked "if he recalled having previous police interactions with Victor White, III. Cpl. Ortis acknowledged that in his first LSP

---

[16]      Rec. Doc. 55-4, p. 8.

[17]      Rec. Doc. 55-4, p. 4.

[18]      Rec. Doc. 55-3, p. 27.

interview, he denied having had prior dealings with White.  However, following his first interview, at the request of LSP detectives, IPSO personnel conducted research through their CAD system.  The IPSO personnel informed Cpl. Ortis he had, in fact, had a prior police interaction with White in November of 2013.  Cpl. Ortis did not recall his previous interaction with White until it was brought to his attention."[19]

The dash cam video from Ortis's unit clearly shows, rather than a pat-down search for weapons outside of White's clothing as he did with Lewis, Ortis searched very thoroughly *inside* White's front *left* pants pocket and retrieved something before White was handcuffed.  The audio is not activated.  Immediately afterward, White was handcuffed behind his back and seated on the ground at the front of the unit where he remained while Lewis was patted down and for several minutes afterwards. At this point, the factual accounts of the searches and seizure become quite varied.

In the LSP report, MT Morel reports "the initial pat-down of Victor White, III, revealed he had a small bag of (what appeared to be and what White confirmed it to be) marijuana concealed in the outer, *right*, front pants pocket of his jeans.  White was then restrained behind his back in handcuffs by Cpl. Ortis.  A second pat-down of White's outer clothing revealed a small bag of (what appeared to be) white

---

[19]    Rec. Doc. 55-4, p. 2.

powdered cocaine concealed in his small, *right*, front, 'jewel-holder' pants pocket. Cpl. Ortis had not located any weapon on White, up to that point."[20]

In his report time stamped March 12, Ortis stated: "Cpl Ortis first did a pat down of White. Cpl Ortis detected a small bulge in the front *right* pants pocket. Cpl Ortis asked White what the bulge was and White replied, "that's marijuana." Cpl Ortis then removed the suspected marijuana which was inside a jewelers bag or "dime bag" and placed the item into Cpl Ortis' left hand, which were holding White's hands. Cpl Ortis then started again with the pat down of White by raking my hand across the back and front waistband area and each remaining pockets. Cpl Ortis found nothing of interest and placed White into handcuffs. Cpl Ortis advised White he was being detained for a narcotics investigation and placed White sitting in front of the patrol unit."[21]

Ortis's report goes on to state that White was read his *Miranda* rights and questioned at the rear of the unit. This questioning was out of view of the dash cam. Ortis stated he "advised White he would remove his property to keep track of it in case he would have to go to jail. While removing White's property, Cpl Ortis located

---

[20]     Rec. Doc. 55-3, p. 15. (Emphasis added).

[21]     Rec. Doc. 55-7, p. 9.

a small jewelers bag of powder cocaine, US Currency, Cell phone, Leather Wallet, coins, a key and a pack of Cigarillos."[22]

In the initial interview given by Ortis to LSP on March 5 regarding the description of the searches and seizure, Ortis stated that he handcuffed White after he found the marijuana, then completed the "brief pat down" and "having felt no other bulges in White's outer clothing. . . had White sit down on the road." In this version of the events of March 2, Ortis informed White that he was "going to remove the rest of his property from his pockets in order to keep all of it together, just in case he did go to jail. As he emptied White's pockets, he located a wallet; cell phone; U.S. Currency and coins, a house key; and in the small, right, front "jewel" pocket - a dime bag of white powdered cocaine."[23]

According to the LSP report of the interview of Lewis, "the pat-down of White's outer clothing revealed White had a small amount of suspected marijuana in his (left front) pants pocket. . . . Cpl. Ortis handcuffed White (behind his back) but informed him he would not be going to jail for such a small amount [of] marijuana. Later, Cpl. Ortis told White, though he was not going to jail at that point, he had to

---

[22]      Rec. Doc. 55-7, p. 9.

[23]      Rec. Doc. 55-3, p. 26.

detain him. . . . Cpl. Ortis later put White in the back seat of [the] police unit and Lewis remained seated on the ground in front of the police unit."[24]

The dash cam video reveals the first search and Ortis finding what is not readily identifiable but was allegedly marijuana. Neither the other "pat-down" nor the retrieval of White's property from his pockets occurred in view of the camera. What is visible is that White was handcuffed with his hands behind him. According to the LSP report, the dash cam video from Javier's unit depicted White displaying "good mobility and much flexibility in his arms and hands, as he was able to reach around the left side of his body, bringing his hands towards, the front of and above his left pants pocket."[25] The dash cam video from Javier's unit was not provided.

According to the LSP report, "White immediately told Cpl. Ortis he did not want to go back to jail and requested to speak with a narcotics officer."[26] According to Ortis in his first interview, "White was very concerned about the possibility of having to go to jail. He inquired several times if he was going to jail. He wanted Cpl. Ortis to promise him he would not go to jail."[27]

---

[24]    Rec. Doc. 55-4, p. 8.

[25]    Rec. Doc. 55-3, p. 29.

[26]    Rec. Doc. 55-3, p. 15.

[27]    Rec. Doc. 55-3, p. 26.

According to Ortis's statement in his first interview, after Ortis drove White to the patrol center ostensibly to meet with a narcotics agent, Ortis "exited his unit then opened the rear driver's side door and instructed White to get out of the vehicle so they could go inside and talk. White refused to get out of the unit. He said he could not go back to jail then he began to cry. He said he couldn't go to jail no more and to tell his people he loved them. . . Lt. Schmidt walked out to Cpl. Ortis' unit and positioned himself in the opened rear (driver's side) doorway, as Cpl. Ortis stood nearby. Lt. Schmidt leaned in and told White he needed to get out of the vehicle or they would have to 'drag him out.'"[28]

Lt. Schmitt's statement is slightly different but is consistent with regard to White's concern about going to jail. According to Lt. Schmitt's statement given to LSP, "he walked over to the opened rear door and said to White, 'Come on, man. You gonna have to get out of the car. You know; one way or the other. White replied, 'Nah, I don't want to go to jail. I don't want to go to jail. I said, Well, we haven't established that, yet. We still, still need to talk to the narcotics agent, but you have to get out of the car. And then White said 'I'm gone!' And right after he said that, that's when I heard the gunshot."[29]

---

[28]    Rec. Doc. 55-3, p. 26.

[29]    Rec. Doc. 55-3, p. 19.

In his deposition testimony, Lt. Schmitt testified on multiple occasions about White's concern about going to jail. When Schmitt first approached White, "he was saying that he couldn't go to jail. He kept repeating that, and he needed to talk to somebody. So I asked him, I said, 'Are you – are you wanting to talk to a narcotics agent?' and he said, 'I just need to talk to somebody.' I said 'Okay. Well it's not the end of the world yet, you know."[30] Schmitt testified again "I told Mr. White, I said, 'Look man, you're going to have to get out the car (sic). You can't stay in the car all night long.'" When asked what White said in response to this statement, Schmitt testified, "[h]e kept saying that he couldn't go back to jail and he couldn't go back to jail. And that's – that's just what he kept repeating."[31]

Lt. Schmitt did not remember saying to White that if he did not get out of the car, Schmitt would drag him out, but he did testify that "I just told him he was going to have to get out of the car, and he just kept saying, 'I can't go to jail. I can't go to jail.'"[32] Schmitt went on to testify, "I told him a couple of times to get out of the

---

[30]    Rec. Doc. 61, p. 9. (Trs. p. 32).

[31]    Rec. Doc. 61, p. 13. (Trs. p. 46).

[32]    Rec. Doc. 61, p. 14. (Trs. pp. 51-52).

vehicle. He kept saying, 'I can't go to jail. I can't go to jail,' and – then he said, 'I'm gone.'"[33]

At that point, Lt. Schmitt heard what he described as a pop. He stepped back and drew his weapon which had a light on it. He observed White slumped over in the back seat. Schmitt testified that he removed White from the unit, removed the handcuffs, and began first aid. White ultimately succumbed to a gunshot wound that entered his right chest, perforated his right 5th intercostal space, right lung, heart, left lung, and 6th intercostal space, then exited his left lateral chest near his left armpit – a trajectory from right to left, slightly upward, and slightly front to back.[34] White also was noted to have two abrasions on the left side of his face, one above the left eyebrow and one on the left upper cheek.[35] There is conflicting evidence in the LSP report and autopsy report as to whether these abrasions existed before or after the arrest and/or the shooting.

The plaintiff contends that the fatal gunshot wound was not self-inflicted and that Victor White, III was killed because (a) his hands were handcuffed behind his back; (b) he was thoroughly searched which leads to the presumption that if small

---

[33]     Rec. Doc. 61,  pp. 14, 21. (Trs. pp. 51, 78).

[34]     Rec. Doc. 55-2, pp. 4, 5-6.

[35]     Rec. Doc. 55-2, p. 9.

amounts of drugs and various personal effects were retrieved from his clothing, the weapon would have been found; (c) there is a pattern and practice of excessive force by deputies toward arrestees within the IPSO; and (d) there are inconsistencies in the investigation conducted by the IPSO such that the cause of death is very much in controversy.

The defendant contends that there is no such evidence and that all of the evidence suggests that White committed suicide. Even assuming that to be the case, there are additional facts set forth in the *defendants'* exhibits that make summary judgment improper.

According to the LSP report, Victor White, II, the decedent's father, believed that his son, when arrested by the same officers in November of 2013, was targeted and injured by IPSO deputies.[36] According to the interview given to LSP:

> Early on in this investigation, Reverend White expressed his concerns that the same two deputies who interacted with his son on the night of March 2nd and morning of March 3rd were the same two deputies who stopped and arrested his son in November of 2013.
>
> According to Rev. White, while Victor III was incarcerated in November of 2013, he sustained injuries (that included a separated shoulder) at the hands of several deputies. Rev. White is of the belief

---

[36] Rec. Doc. 55-3, p. 32.

that Iberia parish deputies have targeted and/or mishandled and/or injured his son in the past and may have done so again.[37]

The record reflects that the decedent was arrested on November 14, 2013 and that there were "no documented notes, or medical notations, or hospital/doctor visits in Victor White's Incarceration/Medical Records file referencing any injury White received while in jail during his arrest in November of 2013, as stated by Reverend White."[38]

The decedent was also arrested on July 26, 2011, and while the record references a medical screening, there are no medical reports attached although there is a reference to "Attachment #25."[39]

On March 9, 2016, Sheriff Ackal and Gerald Savoy, a supervisor at the IPSO, were indicted by the Grand Jury on one count of conspiracy against rights in violation of 18 U.S.C. § 241, and Sheriff Ackal was also indicted on two counts of deprivation of rights in violation of 18 U.S.C. § 242.[40]  The indictment identifies the warden at the Iberia Parish Jail, along with multiple members of the narcotics unit, as co-conspirators who participated in a "shakedown" at the jail in April 2011,

---

[37]     Rec. Doc. 55-3, p. 33.

[38]     Rec. Doc. 55-4, p. 5.

[39]     Rec. Doc. 55-4, p. 6.

[40]     Rec. Doc. 63-4.

approximately three months before White's arrest in 2011. It is alleged in the indictment that during the shakedown five pre-trial detainees were assaulted and beaten in a chapel, where the activities were not subject to video recording, when the detainees were not posing a threat to anyone.[41] The warden of the IPSO jail, who served from December 2009 until October 2013, and a number of deputies who served on the narcotics unit from as early as 2008 until after White's death pleaded guilty to federal criminal charges arising out of this incident and others which occurred at different times, including September 2011.[42] Sheriff Ackal was tried and acquitted.

Video surveillance footage from the jail recorded on December 6, 2012, which was published in the news media, demonstrated an Iberia Parish jail inmate, Marcus Robicheaux, being assaulted and beaten by a deputy during a contraband sweep while a K-9 bit Robicheaux in the arms, legs, and torso.[43]

---

[41] Rec. Doc. 63-4.

[42] As set forth below, this Court takes judicial notice of the stipulated factual basis for the guilty pleas contained in the records of the court in this district in *United States vs. Wesley Hayes,* 6:16-cr-34; *United States v. Robert Burns,* 6:16-cr-33; *United States v. Wade Bergeron,* 6:16-cr-32*; United States v. Byron Lasalle ,*6:16-cr-35; *United States v. Bret Broussard,* 6:16-cr-36; *United States v. Jesse Hayes,* 6:16-cr-37; *United States v. Jason Comeaux, 6:*16-cr-45; *and United States v. Jeremy Hartley,* 6:16-cr-64.

[43] Hannah Rappeleye*, Video: Inmate Thrown on Ground, Attacked by Dog, Stomped on by Iberia Parish Deputy in Shcocking Surveillance Footage,* The Acadiana Advocate, May 3, 2015, http://www.theadvocate.com/acadiana/news/crime_police/article_b0f41d5a-4bbc-5c2c-8e6e-422b5b70b4e8.html.

Finally, there are admissions by a former member of the IPSO narcotics unit that on or about March 14, 2014, less than two weeks after White's death, he with the help of another narcotics agent, after meeting with a "high-ranking IPSO official and another IPSO supervisor" where he was told to "take care of" an individual, assaulted and battered an individual who was restrained and compliant.[44]

In his deposition, Lt. Schmitt denied any knowledge of the incidents which formed the subject matter of the convictions referenced above.[45]  If Ortis has been questioned on this subject, it is not contained in the record.

It is well established law that Ortis was required to take measures to protect White while he was in custody.  Ortis demonstrated for MT Morel the type of search that he said he conducted on White.  He admitted that he did not conduct a thorough pat-down search when White was detained on the side of the road, it was not done the way he was trained to search, "nor did he do it the way he normally does it."[46] However, other evidence in the record indicates, either as part of a second "pat-down" search, or as part of an inventory of White's belongings while he was handcuffed, that Ortis went through White's pockets and retrieved various personal items including

---

[44]     *United States v. Hines,* 6:16-cr-44, Rec. Doc. 5-2.

[45]     Rec. Doc. 61, pp. 31-32.  (Trs. pp. 119-1220).

[46]     Rec. Doc. 55-3, p. 27.

a wallet,[47] cell phone, U.S. currency, a house key, and a small bag of cocaine in the

right front "jewel pocket."[48]

Ortis suggested, and the LSP report indicates in multiple locations, that White

was never "arrested" but was "detained" for a narcotics investigation when he was

taken to the patrol center.[49]  However, Lt. Schmitt testified repeatedly that this was

a narcotics arrest.[50]  The IPSO defines arrest consistently with Lt. Schmitt's

characterization and not that of Ortis.[51]  Lt. Schmitt also described what he considered

a pat-down search that an officer can/should conduct and that it is limited to a pat-

down of the outer clothing for weapons absent consent or probable cause to do an

entire search.[52]  On the other hand, with regard to the search of Victor White, III at

the initial stop by Ortis, Sheriff Ackal testified:

---

[47]     The Court notes at one point Ortis stated in the LSP report neither White nor Lewis had personal identification on them, thus the reason for him questioning them as to their personal information. The Court is somewhat perplexed that a wallet would not contain personal information, however, there is no indication in the record whether the wallet did, in fact, contain any personal identification of White.

[48]     Rec. Doc. 55-3, p. 26.

[49]     Rec. Doc. 55-3, p. 27.

[50]     Rec. Doc. 61, p. 11, (Trs. pp. 37-38).

[51]     Rec. Doc. 55-4, p. 31.

[52]     Rec. Doc. 61, p. 29. (Trs. pp. 109-112).

Q: Let me ask you this: under what circumstances would Justin Ortis have been allowed to go in Victor White's pockets, and search his pockets?
A: Contraband.
Q: But he wasn't stopped for contraband, correct?
 . . .
A: It doesn't matter whether you're contraband or not, you're going to be searched. And your pockets are going to be checked, for the safety of the –
Q: regardless of –
A: Absolutely.
Q: Regardless of whether he –
A: That's a – that's a right we have. Absolutely.[53]

In the LSP report, the policy of the IPSO for a "stop" is defined as follows:

A stop is a temporary detention of a person for investigative purposes.
A stop occurs when a deputy uses his/her authority to compel a person to halt, . . .
The deputy may perform a frisk search of the person(s) for the deputy's personal safety if the deputy believes that the person may have a weapon.[54]

After a thorough search of the record, this Court found no evidence to suggest that Ortis ever believed White had a weapon or that Ortis's safety was ever threatened. Rather, Ortis indicated that he was going to search for "anything illegal" after he had determined that White and Lewis had not participated in the incident which Ortis had been dispatched to investigate. In addition, Ortis described both as

---

[53]     Rec. Doc. 60, pp. 11-2 (Trs. pp. 40-42).

[54]     Rec. Doc. 55-4, p. 31.

very cooperative. His search of White, whom he had known from a previous encounter (which he initially denied to LSP) was markedly different than the pat down of Lewis. Finally, after allegedly discovering contraband and conducting either another pat down or an inventory of personal items in White's possession while White was handcuffed, Ortis did not discover the weapon that ultimately was used in the shooting. Therefore, there is no direct evidence in the record where the gun was located at the time of the search, the transport or immediately before the shooting.

According to the LSP report, Stacie Smith was at the crime scene prior to the arrival of LSP detectives where she "photographed the crime scene and bagged the hands of Victor White, III prior to his transport by Acadian Ambulance to Iberia Medical Center. She then traveled to the Iberia Medical Center where she conducted presumptive gunshot residue tests on both of Victor White, III's hands, using an X-CAT testing device. The tests results came back, gunshot residue 'Detected.'"[55] However, in her deposition, Ms. Smith testified that she did not take the crime scene photographs, she did not bag White's hands, and in fact, she went directly to the hospital where White had been transported by ambulance to perform not one but two gun shot residue tests – the X-CAT referenced in the LSP report and a GSR test that

---

[55]     Rec. Doc. 55-3, pp. 17-18.

she turned over but never saw the results.[56]  She did not do any type of GSR test on either Ortis or Schmitt.[57]

**LAW AND ANALYSIS**

**A.    THE STANDARD FOR RESOLVING A MOTION FOR SUMMARY JUDGMENT**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[58]  A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[59]

The party seeking summary judgment has the initial responsibility for informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[60]  If the

---

[56]    Rec. Doc. 62, pp. 14-15. (Trs. pp. 50, 55).

[57]    Rec. Doc. 62, p. 12. (Trs. p. 44).

[58]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[59]    *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252); *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

[60]    *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[61]   All facts and inferences are construed in the light most favorable to the nonmoving party.[62]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.[63]   The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[64]

## B.   THE STANDARD FOR EVALUATING A SECTION 1983 CLAIM

The complaint states that the plaintiff's claims are brought pursuant to 42 U.S.C. §§ 1983 and 1988 as well as under Louisiana law.  Section 1983 provides a cause of action against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another person's Constitutional rights. Section 1983 is not itself a source of substantive rights; it merely provides a method

---

[61]      *Washburn v. Harvey*, 504 F.3d at 508.

[62]      *Mason v. Lafayette City-Parish Consol. Government*, 806 F.3d 268, 276 (5th Cir. 2015) (citing *Tolan v. Cotton*, __ U.S.___, 134 S.Ct. 1861, 1863 (2014) (per curiam)); *Brumfield v. Hollins*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

[63]      *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 325).

[64]      *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

for vindicating federal rights conferred elsewhere.[65]  To state a section 1983 claim, a plaintiff must:  (1) allege a violation of a right secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.[66]  In this case, the defendants do not contest whether Sheriff Ackal and Deputy Ortis acted under color of law at any relevant time, but they do challenge whether the defendants' actions or omissions are Constitutional violations.

## C.  THE STANDARD FOR EVALUATING QUALIFIED IMMUNITY

Qualified immunity, an affirmative defense to a suit under 42 U.S.C. § 1983, protects government officials in their individual capacity, while performing discretionary functions, not only from suit, but from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

---

[65]      *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979); *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004).

[66]      *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013); *Moore v. Willis Independent School Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

rights of which a reasonable person would have known."[67]  Qualified immunity

protects "all but the plainly incompetent or those who knowingly violate the law."[68]

Although qualified immunity is "nominally an affirmative defense, the plaintiff

has the burden to negate the defense once properly raised."[69]  A defendant's assertion

of qualified immunity is analyzed under a two-prong test.[70]  The first prong asks

whether the plaintiff has shown sufficient facts to "make out a violation of a

constitutional right."[71]  The second prong requires the court to determine "whether

the right at issue was 'clearly established' at the time of defendant's alleged

misconduct."[72] 14

The Supreme Court articulated the analysis as follows:

In resolving questions of qualified immunity at summary judgment,
courts engage in a two-pronged inquiry. The first asks whether the facts,
[t]aken in the light most favorable to the party asserting the injury, . . .

---

[67]     *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  See, also, *Prison Legal News v. Livingston*, 683 F.3d 201, 224 (5th Cir. 2012); *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc).

[68]     *Whitley v. Hanna*, 726 F.3d at 638 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[69]     *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d at 326).

[70]     *Mason v. Lafayette City-Parish Consol. Government*, 806 F.3d at 275, (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[71]     *Id.*

[72]     *Id.*

show the officer's conduct violated a [federal] right[.] .When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. Governmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [T]he salient question is whether the state of the law at the time of an incident provided "fair warning" to the defendants that their alleged [conduct] was unconstitutional.

Courts have discretion to decide the order in which to engage these two prongs. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. In making that determination, a court must view the evidence in the light most favorable to the opposing party.

Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when a court decides only the clearly-established prong of the standard. In cases alleging unreasonable searches or seizures, we have instructed that courts should define the "clearly established" right at issue on the basis of the specific context of the case. Accordingly, courts must take care not to define a case's context in a manner that imports genuinely disputed factual propositions.[73]

---

[73]     *Tolan v. Cotton,* ___ U.S. ___, 134 S.Ct. 1861, 1865-66 (2014) (internal quotation marks and citations omitted). See, also, *Pratt v. Harris Cty. Tx.,* 822 F.3d 174, 181 (5th Cir. 2016).

**D.** **T**HERE IS A GENUINE ISSUE OF FACT WHETHER **V**ICTOR **W**HITE, **III** COMMITTED SUICIDE.

The defendants' motion for summary judgment rests primarily on the contention that White intentionally committed suicide. In support of their contention, the defendants submitted the coroner's report, the LSP report and the deposition of Lt. Schmitt. The reports, standing alone, are not summary-judgment-style evidence that can be relied upon for the undisputed and only conclusion that the gunshot wound that killed White was intentionally self-inflicted.

Under Louisiana law, a coroner's report is admissible to prove the fact and/or the cause of death, but it is not competent evidence of any other fact.[74] It is admissible as an exception to the hearsay rule because it does not offer proof of guilt or innocence and does not implicate the accused.[75] Implicit in this principle is the notion that any opinion contained in a coroner's report that does implicate a person in causing either his own death or someone else's is the sort of opinion or conclusion that must be excluded. The coroner's report establishes the fact that White died of a single gunshot wound. The conclusion that it was (a) self inflicted and (b) the result of intentional suicide is the coroner's opinion that is based on credibility

---

[74]    La. Code Crim. P. art. 105.

[75]    *State v. Russell*, 42,479 (La. App. 2 Cir. 9/26/07), 966 So.2d 154, writ denied, 07–2069 (La. 03/07/08), 977 So.2d 897. *State v. Harmon*, 139 So.3d 1195, 1207, 2013-1211 La.App. 3 Cir. 6/4/14, 18 (La. App. 3 Cir. ,2014).

-30-

determinations and to some degree pure speculation.  The plaintiff contends that it is not possible for White to have drawn a weapon from somewhere on his person, that was not discovered by Ortis in either his original or subsequent search of White, and then intentionally fire a fatal shot that entered his lower right chest while his hands were handcuffed behind his back.  The coroner's opinion to the contrary is just that – an opinion that is derived, at least in part, on credibility determinations applicable to the statements of the officers and the assumption that White could physically retrieve the weapon and fire the fatal shot while handcuffed with his hands behind his back.  As this Court must draw all inferences in favor of the non-movant, the coroner's opinion at this stage is insufficient to warrant summary judgment in the defendants' favor.

With regard to the LSP report, under Rule 803 of the Federal Rules of Evidence, '[A] record or statement of a public office" is excluded from the hearsay ban if, in a civil case, it sets out "factual findings from a legally authorized investigation; and. . . neither the source of information nor other circumstances indicate a lack of trustworthiness."[76]  In keeping with this rule, the conclusions or opinions contained within an investigatory report that is itself admissible under Rule

---

[76]      Fed. R. Evid. 803(8).

803 are also admissible under the same rule – but only if they are (1) based on factual investigation and (2) trustworthy.[77]

In this case, the trustworthiness of the investigative reports was placed at issue by the deposition testimony of crime scene investigator Stacie Smith. Smith testified that she was called while at home about the shooting and went straight to the hospital, where she tested White's hands for gunshot residue. MT Morel's report says, however, that Smith went to the crime scene first, where she bagged White's hands and took photographs, and then went to the hospital after White had been transported by ambulance and performed an XCAT gun shot residue test which reported "detected."

Smith denied taking any crime scene photographs. She also testified she performed two GSR tests and the result of the second is not apparent in the record. No GSR tests were performed on the officers. Thus the record reflects two significantly different descriptions of the same event – the GSR test or tests – which is critical evidence supporting the cause of death conclusion beyond the single gunshot wound. Whether the manner in which the two GSR tests were conducted impacted the results of the tests such that the reliability of the test results used to

---

[77]    *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991) ("Opinions and conclusions, as well as facts, are covered by Rule 803(8)(C).").

justify the conclusion that White committed suicide is called into question is as yet undetermined. Given the factual discrepancies in the method and number of tests, there is at least some question as to the trustworthiness of the investigation reported by MT Morel.

Likewise, because "[t]here is a substantial danger that the jury will be unduly influenced by the investigator's credibility determinations – determinations which the investigator is no more competent to make than the jury,"[78] conclusions and opinions set forth in an investigative report but relying upon credibility determinations are not admissible. "The prejudicial impact of the investigator's conclusions is significant."[79] "Credibility determinations are for the trier of fact to make, not witnesses."[80]

MT Morel's opinion of whether the gunshot wound was intentionally self-inflicted depends on her finding that Ortis and Schmitt are credible. Only the jury should make that determination, not the investigator or this Court. Ortis, whose information is contradicted in multiple areas, including the search and seizure and his inconsistent statements concerning prior dealings with White, is a critical witness not only as to the fatal gunshot wound, but also as to the details of the arrest, the

---

[78]    *Randle v. Tregre*, 147 F.Supp.3d 581, 599 (E.D.La., 2015) aff'd 670 Fed. App'x 285 (5th Cir. 2016).

[79]    *Id.*

[80]    *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002).

-33-

conversations with White before and after the arrest, as well as the injuries to White's face and how they were caused. Whether White died deliberately by his own hand, accidentally, or at the hand of a sheriff's deputy is an ultimate question to be decided by the jury, and the jury's function in that regard should not be usurped.

**E.    EVEN IF WHITE'S DEATH WAS A SUICIDE, THERE GENUINE ISSUES OF MATERIAL FACT WHETHER THERE WERE CONSTITUTIONAL VIOLATIONS PRECLUDING SUMMARY JUDGMENT.**

### 1.    Was this a valid *Terry* stop?

There are three tiers of police encounters with the public: (1) simple questioning of a citizen without detention; (2) a temporary seizure of the citizen if the officer has reasonable suspicion based upon articulable facts that the person has committed or is about to commit a crime; and (3) an arrest of a citizen if the officer has probable cause to believe a crime has been committed.[81]  A person is seized "only when there is a governmental termination of freedom of movement through means intentionally applied."[82]

The reasonableness of a stop is evaluated under a two-step inquiry. "First, we determine whether stopping the [person] was initially justified by reasonable suspicion. Second, we evaluate whether the officer's actions were reasonably related

---

[81]      *United States v. Zukas*, 843 F.2d 179, 181–82 (5th Cir.1988).

[82]      *Mason v. Lafayette City-Parish Consol. Government*, 806 F.3d at 278, (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)).

in scope to the circumstances that justified the stop."[83]  Officers may briefly detain

pedestrians in public, even without probable cause to arrest them, so long as the

officers have reasonable suspicion to believe that criminal activity is afoot.[84]  Police

officers must base their reasonable suspicion on "specific and articulable facts," not

merely "inarticulate hunches" of wrongdoing.[85]

Based on the description of the individuals involved in the altercation at the

Hop-In, even with the dispute in terms of whether a full description was given by the

dispatcher, Ortis likely had sufficient specific and articulable facts to stop White and

Lewis and question them regarding the altercation.  The record indicates that even

though Ortis concluded that neither were involved in the altercation, he nonetheless

concluded he also had the authority to search them for "anything illegal."  According

to Sheriff Ackal, Ortis had an "absolute right" to search in the pockets of White at

this stage of the stop.

A police officer "who reasonably believes that he is dealing with armed and

dangerous individuals may conduct a limited protective search for weapons."[86]  For

---

[83]     *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013), cert. denied, ___ U.S. ___, 134 S.Ct. 1326, 188 L.Ed.2d 338 (2014).

[84]     *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Baker*, 47 F.3d 691, 693 (5th Cir.1995).

[85]     *Terry*, 392 U.S. at 21- 22.

[86]     *Baker*, 47 F.3d at 693.

purposes of such a pat-down, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."[87]   Although *Terry* permits a warrantless search based on less than probable cause, the extent of the search must be carefully circumscribed.   The purpose of such a search is to enable the officer to take steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.   Therefore, the officer may only pat down the suspect's outer clothing in an effort to discover weapons.[88]

The dash cam video indicates that Ortis's search of White was more than a pat-down of his outer clothing, particularly when contrasted to Ortis's pat-down of Lewis. Further, there is nothing in this record to suggest that Ortis was in fear for his safety, nor did he mention in his statements that he informed White and Lewis that a search for weapons was the basis he used for searching White.   According to his own statements, Ortis stated that he was searching for "anything illegal."

---

[87]     *Id.*

[88]     *United States v. Maestas*, 941 F.2d 273, 276 (5th Cir. 1991).

Regardless of the constitutional validity of the initial stop, an officer must not extend a stop beyond the valid reasons for that stop.[89]  A Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop.[90]  "[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."[91]

As indicated in the narrative of the LSP report, even though Ortis was apparently convinced that neither White nor Lewis had participated in the altercation at the Hop-In, they were detained beyond the time it took to make that determination. Further, even though outstanding warrant checks were negative, they were detained beyond the time it took to make that determination as well so that Ortis could search for "anything illegal."

The defendants suggest that White consented to the search of his pockets.  The voluntariness of consent is a question of fact to be determined from the totality of all the circumstances.[92]  Six factors must be considered in determining whether a search

---

[89]     *United States v. Santiago*, 310 F.3d at 341.

[90]     *Id*.

[91]     *United States v. Place*, 462 U.S. 696, 709 (1983).

[92]     *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993).

was consensual:  In evaluating the voluntariness of a consent, this Court has looked to six factors:  (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[93]

Absent the testimony of Ortis and/or Lewis, this Court cannot evaluate whether consent was valid on the basis of the video without any audio to go along with it – particularly as it relates to factors three, four, and six.  Therefore, there is a genuine issue of fact whether White's consent, even assuming it was given, was voluntary.

The descriptions of how White was searched, whether with consent or not, prior to having been arrested or not, the alleged admission of the presence of narcotics before or after the search, and whether the second "pat down" or "inventory" of White's pockets was consensual as indicated by Ortis is all in dispute based on the record before the Court.  Therefore, there is a genuine issue of material fact concerning whether White's constitutional rights to be free from unreasonable search, seizure, and detention under the Fourth Amendment were violated.

---

[93] *Id*.

Under § 1983, the statute provides that "Every person who, . . . .subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable. . ." In this circuit, proof of causation includes the elements of cause-in-fact and proximate cause.[94] "An act or failure to act is a cause-in-fact . . . if the act or omission played a substantial part in bringing about or actually causing the injury or damages . . . An act or omission is a proximate cause of the plaintiff's injuries or damages if . . . the injury or damage was a reasonably foreseeable consequence of the act or omission."[95]

If the initial search was illegal, which led to an illegal seizure, which led to such a fear of incarceration that White intentionally took his own life, then a reasonable jury could conclude that the illegal search and seizure was a cause-in-fact of his suicide. However, whether the claimed suicide was a reasonably foreseeable consequence of an illegal search and seizure depends on the facts that have already been identified as being in dispute concerning what Ortis may have known beforehand. Given that all of the ensuing events flowed from the initial search and seizure, this Court cannot rule as a matter of law that even if there was a Fourth

---

[94]    *Fifth Circuit Pattern Jury Instructions* (Civil) § 10.1 fn.3. (2014); *Martinez v. California,* 444 U.S. 277, 284-85 (1980); *Murray v. Earle,* 405 F.3d 278, 290 (5th cir. 2005).

[95]    *Id.*

Amendment violation, it was not the proximate cause of White's death if he died by suicide.

## 2.      **White had a right to be free from excessive force.**

As a pretrial detainee, White had a Fourteenth Amendment due process right to be free from excessive force, and that right has been clearly established.[96] The law is clearly established that a law enforcement officer's use of excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen violates that citizen's constitutional rights.[97] Deadly force is unconstitutional when a suspect poses no imminent threat to the officer and no threat to others.[98]

It goes without saying that if White died at the hand of a sheriff's deputy, while handcuffed in the back seat of a sheriff's office patrol car, then unreasonable and excessive force was used against him. If White intentionally committed suicide or accidentally killed himself with his own gun, then there is no excessive force. However, that is not the only relevant inquiry.

---

[96]      *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("It is clear ... that the Due Process Clause protects a pretrial detainee form the use of excessive force that amounts to punishment."); *Valencia v. Wiggins*, 981 F.2d 1440, 1445 (5th Cir. 1993).

[97]      *Graham v. Connor*, 490 U.S. at 394-95.

[98]      *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d at 278; *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

What is unclear to this Court is how and when White received the wounds to his face. There are multiple conflicting accounts as to whether he had the wounds on his face before or after the fatal shot was fired. The autopsy photographs clearly show the wounds on White's face. The plaintiff suggested that surveillance video footage taken earlier in the evening showed that there were no wounds on his face. This Court cannot make that determination from the video. The defendants suggest that White's face was injured when he slumped forward in the patrol car after being shot, apparently based on a comment in the coroner's report. Witnesses who were interviewed by LSP gave conflicting reports of the presence of wounds near White's eye. Based on this evidence, it is not clear when or how the wounds to White's face were sustained.

Once again, two witnesses who have not been deposed could shed at least some light on whether White had those wounds at the time of the arrest – Lewis and Ortis. If White received those wounds while handcuffed and in custody before the fatal shots were fired, not only could that constitute excessive force, it could justify a reason to refuse to get out of the car for fear of further retribution at the Iberia Parish jail. This also creates a genuine issue of material fact as to whether there was a Fourth Amendment violation.

### 3. Deliberate indifference to the safety of the detainee

Pretrial detainees have a constitutional right not to have confining officials treat their basic needs – including a need for reasonable safety – with deliberate indifference, under the Due Process Clause of the Fourteenth Amendment.[99]  This right was clearly established law at the time of the incident in question.[100]

"The State's exercise of its power to hold detainees and prisoners. . . brings with it a responsibility under the U.S. Constitution to tend to the essentials of their well-being:  when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – e.g., . . . reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."[101]

A party alleging that an "episodic act or omission" resulted in an unconstitutional violation of a pretrial detainee's Fourteenth Amendment rights is

---

[99]      See *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir.2000) ("Unlike convicted prisoners, whose rights to constitutional essentials like medical care and safety are guaranteed by the Eight[h] Amendment, pretrial detainees look to the procedural and substantive due process guarantees of the Fourteenth Amendment to ensure provision of these same basic needs." (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)).

[100]      See, *Estate of Allison v. Wansley*, 524 Fed. App'x 963, 970, 2013 WL 1983959, at *6 (5th Cir. 2013).

[101]      *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 638-39 (5th Cir. 1996) (en banc) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200) (internal quotation marks omitted).

required to show that the official's action constituted "deliberate indifference."[102] An episodic act or omission of a state official does not violate a pretrial detainee's due process right to medical care or protection from suicide unless the official acted or failed to act with subjective deliberate indifference to the detainee's rights, as defined by the United States Supreme Court. "[D]eliberate indifference entails something more than mere negligence [and]. . . something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."[103] In other words, "deliberate indifference [lies] somewhere between the poles of negligence at one end and purpose or knowledge at the other."[104] "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."[105] The Court also explained that to act recklessly in this context means to consciously disregard a substantial risk of serious harm.[106]

The standards applicable to the facts of this case may be stated as follows:

---

[102]   *Hare*, 74 F.3d at 647-48.

[103]   *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

[104]   *Id.,* at 836.

[105]   *Id.*

[106]   *Id.,* at 839-40.

A prison official acts with subjective deliberate indifference when he (1) "knew of" and (2) "disregarded an excessive risk to the [detainee's] health or safety." *Brumfield v. Hollins*, 551 F.3d 322, 331 (5ᵗʰ Cir. 2008) (*citing Gibbs v. Grimmette*, 254 F.3d 545, 549 (5ᵗʰ Cir. 2001) (alteration in original). The law is clearly established that "jailers must take measures to prevent inmate suicides once they know of [a] suicide risk." *Jacobs [v. West Felciana Sheriff's Department,* 228 F.3d 388 (5ᵗʰ Cir. 2000)] at 394-95. (*citing Hare v. City of Corinth,* 135 F.3d 320, 328-29 (5ᵗʰ Cir. 1998)). Nevertheless, "*negligent* inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State." *Id.* at 395. "Accordingly, to be considered deliberately indifferent to a known suicide risk, an officer's acts must constitute at least more than a mere 'oversight.'" *Id.* The officer must be "aware of a substantial and significant risk" that the prisoner will commit suicide and "effectively disregard [] it."[107]

Lt. Schmitt testified and Ortis stated in the LSP report that White repeatedly demonstrated a reluctance to get out of the unit at the patrol center. If White had a valid reason for not wanting to get out of the car and he made either Ortis or Lt. Schmitt aware of that reason and neither of the deputies then consciously failed to address a risk to White's safety, a reasonable jury could conclude the officers acted with deliberate indifference to White's rights. For example, if White had been assaulted or beaten by a sheriff's deputy on a prior occasion while incarcerated (perhaps at the hands of the same deputy who had him in custody on the night White died as suggested by Victor White II), or if White had been assaulted or beaten by a sheriff's deputy on that very night and then threatened with being dragged out of the

---

[107]     *Nagle v. Gusman*, 61 F.Supp.3d 609, 628 (E.D. La. 2014).

unit to be taken to jail, the jury could find deliberate indifference. However, absent evidence from which that subjective knowledge could at least be inferred by this Court, the plaintiff's Fourteenth Amendment claim based on deliberate indifference must fail.

There is no evidence in the record that Ortis subjectively knew whether White was an excessive risk to his own safety as he has not been deposed. What is in the record is that Ortis knew White from a prior occasion in which White was arrested by Ortis, something Ortis initially denied in the initial investigation but admitted to later on, and Victor White, II indicated his son had possibly been the target of deliberate injury by IPSO officers. There is nothing in the deposition transcript of Lt. Schmitt to suggest that he subjectively knew whether White was an excessive risk to his own safety. Ortis's credibility is critical to this issue and his testimony is essential.

Pursuant to Fed.R.Civ. P. 56(e), "[I]f a party . . . fails to properly address another party's assertion of fact as required by Rule 56 (c), the court may: (1) give an opportunity to properly support or address the fact . . ." This Court has given the plaintiff the opportunity to depose Ortis, and therefore defers ruling on the plaintiff's Fourteenth Amendment claim of deliberate indifference until such time as that deposition has been taken; and if any submissions need to be made, the parties shall

seek leave of Court to do so. If no submissions need to be made, or in good faith cannot be made in compliance with Fed. R. Civ. P. 11, the Court will dismiss those portions of the plaintiff's complaint.


## F. SOME OF THE CLAIMS AGAINST SHERIFF ACKAL CANNOT BE DISMISSED BY SUMMARY JUDGMENT.

The claims against Sheriff Ackal are brought both in his individual and official capacity. A suit against a government official in his official capacity is a suit against the government entity of which he is an agent.[108] Municipalities are not vicariously liable for violations committed by their employees, but they are liable when their official policies cause their employees to violate another person's constitutional rights.[109] Therefore, a claim of municipal liability under § 1983 requires proof of three elements: a policymaker, an official policy, and a violation of constitutional rights whose moving force is the policy or custom.[110] The proper analysis of such claims requires an inquiry into two separate issues: "(1) whether plaintiff's harm was

---

[108]    *Burge v. Parish of St. Tammany,* 187 F.3d 452, 468 (5th Cir. 1999).

[109]    *Jones v. Lowndes County, Miss*., 678 F.3d 344, 349 (5th Cir. 2012); *Baker v. Putnal*, 75 F.3d at 200.

[110]    *Doe ex rel. Magee v. Covington County School Dist. ex rel. Keys*, 675 F.3d 849, 867 (5th Cir. 2012), quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."[111]

A city's official policies include any persistent, widespread practice of city officials or employees that is not authorized by officially adopted and promulgated policy, but is so common and well settled as to constitute a custom that fairly represents municipal policy.[112]

As set forth herein, there are genuine issues of material fact concerning whether the search and seizure of White was constitutional. Sheriff Ackal testified that his officers had an absolute right to search the pockets of White contrary to the stated policy of IPSO contained in the LSP report and the parameters for a search in a *Terry* stop. Therefore, as Sheriff Ackal is a policymaker, and there is a genuine issue of fact whether the policy of Sheriff Ackal was that IPSO deputies could conduct a full search of someone's person without probable cause in the context of a *Terry* stop, summary judgment on the official capacity claim must be denied.

In order to assert a valid claim against an official in his individual capacity, a §1983 claimant must establish that the defendant was either personally involved in a constitutional deprivation or that his wrongful actions were causally connected to

---

[111]     *Doe ex rel. Magee*, 675 F.3d 867, quoting *Collins v. City of Harker Heights, Tex.* 503 U.S. 115, 120 (1992).

[112]     *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012).

the constitutional deprivation.[113] "Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability."[114] "A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury."[115] To establish supervisor liability for constitutional violations committed by subordinate employees, the plaintiffs must show that the supervisor acted or failed to act with deliberate indifference to the violation of others' constitutional rights committed by their subordinates.[116] Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action."[117] The law is also clearly established that an official may be held liable under Section 1983 for implementing a policy of allowing or tolerating the use of excessive police force.[118]

---

[113]     *Jones v. Lowndes County, Miss.*, 678 F.3d at 349.

[114]     *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001).

[115]     *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011), quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).

[116]     *Porter v. Epps*, 659 F.3d at 446; *Gates v. Texas*, 537 F.3d at 435.

[117]     *Porter v. Epps,* 659 F.3d at 447, quoting *Connick v. Thompson,* 131 S.Ct. 1350, 1360 (2011).

[118]     *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984).

For the same reasons set forth in the official capacity claim, there is a genuine issue of material fact whether Sheriff Ackal implemented a policy whereby individuals such as White were subjected to full searches without probable cause in the context of a *Terry* stop. There is also evidence from which an inference may be drawn in favor of the non-movant that Sheriff Ackal implemented a policy of allowing or tolerating the use of excessive force toward pre-trial detainees. Therefore, the motion for summary judgment on this basis is denied.

The plaintiff has also asserted a claim for failure to properly train and supervise the IPSO deputies. A municipality may incur §1983 liability for its employees' acts when a municipal policy of hiring or training causes those acts.[119] When such a claim is asserted, the plaintiff must show (1) that the training or hiring procedures of the municipality's policymaker were inadequate; (2) that the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy; and (3) that the inadequate hiring or training policy directly caused the plaintiff's injury.[120]

A supervisor may be liable for failure to supervise or train if: (1) the supervisor failed to supervise or train the subordinate officer; (2) a causal connection exists between the failure to supervise or train and the violation of the plaintiff's

---

[119]     *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992); *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010).

[120]     *Baker v. Putnal*, 75 F.3d at 200; *Benavides v. County of Wilson*, 955 F.2d at 972.

rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights.[121]

There is no evidence in the record pertaining to a failure to train or supervise beyond the conclusory allegations in the complaint and questions of Sheriff Ackal that do nothing more than establish that the Sheriff is ultimately responsible for training the deputies. Ortis stated in the LSP report that he did not conduct the search of White the way he was trained to do. The plaintiff has offered no opposition to this aspect of the claim and the Court finds the plaintiff has not met her burden and summary judgment will be granted as to the failure to train or supervise allegations.

**G. THE STATE LAW CLAIMS ALSO CANNOT BE DISMISSED BY SUMMARY JUDGMENT.**

The claims under state law for failure to protect a person in custody from self-injury fall under a different standard than the federal claims. This analysis follows a traditional duty/risk analysis under Louisiana tort law. Under *Misenheimer v. West Baton Rouge Parish Sheriff's Office,* 95-2427, 677 SO.2d 159, 161 (La. App. 1st Cir 6/28/1996), *writ denied*, 96-1853, 681 SO.2d 371 (La. 10/25/1996), the scope of the duty is a question of policy and "the proper inquiry is how easily the risk of injury to the [injured person] can be associated with the duty sought to be enforced." In the

---

[121] *Porter v. Epps*, 659 F.3d at 446; *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009); *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).

context of this case, the duty to protect a prisoner from self-harm arises when the custodian "knew or should have known of the risk."[122]

As previously pointed out, in addition to the indictment submitted by the plaintiff, the admission by Sheriff Ackal and Lt. Schmitt, the Court takes judicial notice of the stipulated factual basis for the guilty pleas of the warden and multiple narcotics officers, the surveillance video from the IPSO jail reported in the press concerning use of excessive force against pre-trial detainees by IPSO personnel. Specifically, this Court *does not* take judicial notice that the instances so referenced are in fact true as that exceeds the judicial notice rules and is left for trial and the trier of fact.[123]  However, the court may take judicial notice of fact that the stipulated factual bases were made under oath at the time of the plea colloquy, and to show that the documents/video do exist, are authentic, and "they say what they say, and they have legal consequences.[124] Assuming solely for the purposes of this motion, whether Ortis was aware of these instances, and whether he actually participated in such conduct as suggested by Victor White, II, given the emphatic reluctance by the

---

[122]     *Scott v. State* 618, So.2d 1053, 1058 (La. App. 1st Cir. 1993); *Nagle v. Gusman,* 61 F.Supp. 3d at 625.

[123]     *McCorstin v. U.S. Dept. Of Labor,* 630 F.2d 242, 244 (5th Cir. 1980).

[124]     See *Seal v. Harrison County, Miss. Ex rel. Bd. of Sup'rs,* 2010 WL 2545406, *11-14 ( S.D. Ms. 6/18/2010); *In re Smith,* 2012 WL 1123049 *1-2, (Br. W.D. Tx. 4/3/2012).

decedent to go to jail or to even to get out of the car at the patrol center, which is uncontested, there is a genuine issue of material fact as to whether Ortis had reasonable cause to believe Victor White, III was so afraid of returning to the IPSO jail that he would consider taking his own life.

In addition, Ortis admitted he did not properly search White for a weapon. The purpose of a law enforcement officer's being permitted to frisk or pat-down an individual during a *Terry* stop is to look for a weapon that might harm either the officer or the  person being searched.  If White was carrying a handgun, and Ortis searched White – not once but twice – and failed to find that handgun – and White later used that weapon to kill himself, whether accidentally or intentionally, then his death might be attributable to Ortis' negligence in failing to locate the weapon. Similarly, if a handgun was left on the back seat of Ortis's unit and that handgun was later used by White to kill himself, accidentally or intentionally, then his death might be attributable to Ortis' negligence in failing to secure the weapon before White was placed in the unit.  Therefore, even if White fired the gunshot that killed him, his death might have resulted from negligence on the part of Ortis.

With regard to the assault/battery claims, this Court has already concluded thee is a genuine issue of material fact as to how White got the injuries to his face. For the

same reasons, the Court will deny the motion as it pertains to the state law claims of assault and battery.

<h2 align="center">CONCLUSION</h2>

For the reasons set forth above, this Court finds that there are genuinely disputes issues of material fact that preclude summary judgment in favor of the defendants. First and foremost, the issue of whether White's death was the result of suicide, accident, or homicide has not been conclusively established and is genuinely disputed. This factual issue, standing alone, is sufficient to preclude summary judgment. Furthermore, there is a genuinely disputed issue of material fact concerning whether Ortis' search and detention of White satisfied the criteria of *Terry v. Ohio* or was an unconstitutional search and seizure. Assuming there was a Fourth Amendment violation, there are genuine issues of fact as to whether that was a proximate cause of White's death even assuming his death was a suicide or accidental.

Since it is undisputed that White died while in the custody of Iberia Parish sheriff's deputies, given the other contested issues of fact, there is a genuinely disputed issue of material fact concerning whether the Ortis and/or Schmitt failed to protect White and whether that failure resulted from the deliberate indifference to

White's constitutional rights, or was the result of negligence on the part of Ortis. Also genuinely disputed is whether White was assaulted or battered by Ortis. Finally, there are issues of fact whether Sheriff Ackal endorsed or put in motion a policy of illegal searches and/or the use of excessive force on pre-trial detainees. The existence of these genuinely disputed and quite material issues of fact require that the defendants' motion for summary judgment (Rec. Doc. 55) be denied in part.

However, the Court finds there is no basis for an Eighth Amendment violation as White was not convicted, and there is no evidence in the record to support a failure to train claim under § 1983. Therefore, summary judgment will be granted as to those claims and they will be dismissed with prejudice.

Signed at Lafayette, Louisiana on this 22nd day of October, 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE